**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION**

**WILLIAM T. SMITH**                                                                                    **PLAINTIFF**

**v.**                                        **Case No. 3:22-cv-00042-LPR**

**CRITTENDEN COUNTY, ARKANSAS**                                            **DEFENDANT**


**ORDER**

This case concerns purported employment discrimination and retaliation. Plaintiff William T. Smith alleges that Defendant Crittenden County discriminated against him because of his race.[1] Mr. Smith also alleges that the County engaged in unlawful retaliation against him because he began looking into whether the County paid Black truck drivers less than white truck drivers, and because he questioned why a white truck driver was not required to take a drug test after an accident even though Mr. Smith (who is Black) had been required to do so.[2] Based on these allegations, Mr. Smith brings claims sounding in disparate treatment, hostile work environment, and retaliation.[3] Crittenden County disputes Mr. Smith's allegations.[4]

Before the Court is Crittenden County's Motion for Summary Judgment.[5] Crittenden County asks for judgment in its favor on all claims brought by Mr. Smith.[6] And, for the reasons discussed in the rest of this Order, Defendant is entitled to summary judgment on all claims. Accordingly, the Court GRANTS the County's Motion for Summary Judgment in its entirety.

---

[1] Am. Compl. (Doc. 12) at 3–7.

[2] *Id.* at 3–5; Ex. 1 (EEOC Charge of Discrimination) to Am. Compl. (Doc. 12-1).

[3] Am. Compl. (Doc. 12) at 5–7.

[4] Answer (Doc. 13) at 7–11.

[5] Mot. for Summ. J. (Doc. 24).

[6] Br. in Supp. of Mot. for Summ. J. (Doc. 25) at 1.

1

## I. THRESHOLD ISSUES

Before jumping into the facts, it is prudent to spend some time clearing out the underbrush. Mr. Smith originally brought several claims under Title VII, the Arkansas Civil Rights Act (ACRA), and 42 U.S.C. § 1981 (through § 1983).[7]   But, at the August 22, 2023 summary judgment hearing, Mr. Smith conceded that summary judgment should be granted to Crittenden County on the Title VII claims.[8]   Therefore, Mr. Smith's Title VII claims are out.

Crittenden County has made concessions of its own.   Specifically, the County conceded that Mr. Smith brought ACRA and § 1981 claims that mirrored almost all of his Title VII claims.[9] Of course, "almost all" is not the same thing as "all."   The County does not think Mr. Smith brought an ACRA or § 1981 claim to mirror his Title VII retaliation claim.[10]   Mr. Smith disagrees. He maintains that his retaliation claim was brought under § 1981 (and implicitly, also under ACRA) in addition to Title VII.[11]   Mr. Smith has the better of this argument.

To be sure, Mr. Smith's Amended Complaint is not a model of clarity.   The heading for Count II is labeled "Violation of [Title VII] Retaliation."[12]   The count is primarily comprised of paragraph 23, which alleges that "[w]hen the Plaintiff made complaints about his treatment, pay, and environment, all directly related to his race, the Defendant took the materially adverse

---

[7]  Am. Compl. (Doc. 12) at 5–7.

[8]  Aug. 22, 2023 Hr'g Tr. (Rough) at 10:14:00–04.

[9]  Aug. 22, 2023 Hr'g Tr. (Rough) at 9:25:36–9:27:40.

> The Court: Really the only thing . . . you say he's missing in the [ACRA/§ 1983] stuff is the retaliation claim, is that . . . fair[?]
>
> Ms. Kolb: That's fair[.]

*Id.* at 9:26:30–9:26:41.

[10]  *Id.* at 9:25:36–9:26:41.

[11]  Br. in Supp. of Pl.'s Resp. to Mot. for Summ. J. (Doc. 29) at 3, 11–12.

[12]  Am. Compl. (Doc. 12) at 5.

employment action against him by terminating him."[13]   And Crittenden County is correct in noting that, unlike Count II, Counts V and VI—the counts expressly identifying ACRA and § 1981 violations—do not mention retaliation.[14]   But both Counts V and VI do begin with statements that all "preceding paragraphs of [the] Complaint" are "restate[d] and incorporate[d] . . . as if set forth herein verbatim."[15]   Those "preceding paragraphs" certainly included mentions of and allegations of retaliation.[16]

"Under the liberal notice pleading standards of the Federal Rules of Civil Procedure, [the plaintiff is] only required to give 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"[17]   And the Eighth Circuit has defined "claim," as used in the Federal Rules of Civil Procedure, as "the aggregate of operative facts which give rise to a right enforceable in the courts."[18]   Mr. Smith meets the liberal notice pleading standard with respect to his ACRA and § 1981 retaliation claims, despite the poor way he organized and summarized the counts.   That's because this is not a situation where the way the Amended Complaint was framed prejudiced the opposing party by denying it a realistic opportunity to formulate and carry out its litigation strategy.[19]   Crittenden County was fully aware that it needed to proffer a defense to a retaliation claim.   After all, it fully briefed Mr. Smith's Title VII retaliation claim.[20]   The elements for

---

[13] *Id.*

[14] Aug. 22, 2023 Hr'g Tr. (Rough) at 9:25:36–26:08; Am. Compl. (Doc. 12) at 6–7.

[15] Am. Compl. (Doc. 12) 6–7.

[16] *Id.* at 3–5.

[17] *Shurgard Storage Ctrs. v. Lipton-U. City, LLC*, 394 F.3d 1041, 1046 (8th Cir. 2005) (quoting Fed. R. Civ. P. 8(a)(2)).

[18] *Rhodes v. Jones*, 351 F.2d 884, 886–87 (8th Cir. 1965) (quotation marks and citation omitted); *see also Claim*, BLACK'S LAW DICTIONARY (7th ed. 1999).

[19] *See Baker v. John Morrell & Co.*, 382 F.3d 816, 831–32 (8th Cir. 2004).

[20] Br. in Supp. of Mot. for Summ. J. (Doc. 25) at 25–27.

retaliation claims brought under ACRA and § 1981 are (with incredibly small exceptions not relevant here) the same as the elements for retaliation claims brought under Title VII.[21]   As such, Crittenden County was able to fully formulate and carry out its litigation strategy with respect to all potential retaliation claims.

Now that the Court has concluded that Mr. Smith brought ACRA and § 1981 claims that mirror all of his Title VII claims, the Court will summarize what these claims actually are.   As the Court sees it, Mr. Smith has six live claims that break down into three categories: (1) disparate treatment claims under ACRA and § 1981; (2) retaliation claims under ACRA and § 1981; and (3) hostile work environment claims under ACRA and § 1981.[22]   Armed with this understanding of the claims at issue, the Court is ready to turn to the facts section that will inform the legal analysis of these claims.

---

[21] *See Merritt v. Albemarle Corp.*, 496 F.3d 880, 883 (8th Cir. 2007) (holding that cases "arising under [ACRA]" are reviewed "in the same manner as Title VII claims"); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1063 (8th Cir. 1997) (holding that "Title VII and § 1981 set forth parallel, substantially identical, legal theories of recovery in cases alleging intentional discrimination in employment on the basis of race"); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (holding that Title VII retaliation claims "must be proved according to traditional principles of but-for causation"); *Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 737–38 (8th Cir. 2013) (applying but-for causation to a § 1981 retaliation claim); *Scott v. Union Pac. R.R. Co.*, 595 F. Supp. 3d 758, 785 (E.D. Ark. 2022) (finding that but-for causation applies to ACRA retaliation claims).

[22] This is not how Mr. Smith describes his claims.   His framing references the following five different categories of claims: (1) racial discrimination claims; (2) harassment claims; (3) retaliation claims; (4) disparate treatment claims; and (5) hostile work environment claims.   Am. Compl. (Doc. 12) at 5–6.   Mr. Smith's characterization of his claims is a little off.   "Harassment" is not a distinct claim, but rather is a necessary condition to establish a prima facie hostile work environment claim.   *See Jackman v. Fifth Jud. Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 805–06 (8th Cir. 2013) (treating a harassment claim and a hostile work environment claim as identical); *Butler v. Crittenden Cnty., Ark.*, 708 F.3d 1044, 1049–50 (8th Cir. 2013) (including the occurrence of "unwelcome harassment" as a necessary element of a hostile work environment claim).   And "race discrimination" is simply an umbrella term for the disparate treatment, hostile work environment, and retaliation claims.   *See Palesch v. Mo. Comm'n on Hum. Rts.*, 233 F.3d 560, 566 (8th Cir. 2000) (describing hostile work environment, disparate treatment, and retaliation claims as forms of discrimination claims).   Finally, although Mr. Smith alluded to a potential constructive discharge claim in his Response Brief, *see* Br. in Supp. of Pl.'s Resp. to Mot. for Summ. J. (Doc. 29) at 12, a hostile work environment is "a necessary predicate to a hostile-environment constructive discharge case."   *Pa. State Police v. Suders*, 542 U.S. 129, 149 (2004).   Since, as will be explained below, *see infra* pp. 20–24, Crittenden County did not create a hostile work environment, even if Mr. Smith did properly plead a constructive discharge claim—he didn't—any such claim would necessarily not survive.

## II. BACKGROUND FACTS

On summary judgment, the Court is supposed to consider the record in a very particular way.   First, the Court adopts and considers all undisputed facts.   Second, as to each genuinely disputed fact that is material to the outcome of the case, the Court adopts and considers the version of the fact that is most favorable to the non-moving party and the reasonable inferences from that fact that are most favorable to the non-moving party—in this case, the Plaintiff.[23]   A fact is genuinely disputed if a reasonable jury could decide the fact in favor of either a plaintiff or a defendant.[24]

In light of the foregoing, the story presented below is the most Plaintiff-friendly rendition of the facts that a reasonable jury could conclude occurred.   At a trial, a jury might or might not agree with important parts of this rendition.   And that could significantly change the complexion of this case.   But, for now, here's what happened.

### A. *The Events Leading up to the May 4, 2020 Meetings*

Mr. Smith started working for Crittenden County in the Road Department as a truck driver on June 2, 2016.[25]   Mr. Smith was an "at-will" employee.[26]   Around February of 2020, Brian Loudermilk started serving as Crittenden County's Road Supervisor and thus became Mr. Smith's direct supervisor.[27]   Mr. Loudermilk reported to Crittenden County Judge Woody Wheeless.[28]

---

[23] *See Quinn v. St. Louis Cnty.*, 653 F.3d 745, 750 (8th Cir. 2011).

[24] *See Liberty Ins. Corp. v. HNTB Corp.*, 87 F.4th 886, 888 (8th Cir. 2023).

[25] Def.'s Statement of Undisputed Facts (Doc. 26) ¶¶ 1–2; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶¶ 1–2.

[26] Def.'s Statement of Undisputed Facts (Doc. 26) ¶ 5; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 5.

[27] Def.'s Statement of Undisputed Facts (Doc. 26) ¶¶ 6–7; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶¶ 6–7.

[28] Def.'s Statement of Undisputed Facts (Doc. 26) ¶ 9; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 9.

Mr. Smith's duties included hauling dirt and gravel, riding a mower to cut grass, fixing potholes, using a chainsaw to cut down tree limbs, and generally doing "whatever tasks [he] was asked to do."[29]

Sometime before Mr. Loudermilk became Crittenden County's Road Supervisor, Mr. Smith raised concerns to Judge Wheeless about two pictures posted on the window behind the coffee maker in the lobby of the Crittenden County Road Department's shop.[30]   One picture depicted President Obama kissing Speaker Pelosi on the cheek.[31]   Below the picture were the following words: "DEMOCRAT MATING SEASON HAS BEGUN.   Obama is thinking: 'This proves I am not a Muslim – no Muslim would kiss a pig.'   Pelosi is thinking: 'I've had so many face lifts, you are actually kissing my ass.'"[32]   This picture can be found at Document 29-1 in the record.   The second picture depicted a white man and white woman.[33]   The white woman was holding a baby of mixed race.[34]   Underneath the couple was a black dog.[35]   A white co-worker's name was written on the bottom of the picture.[36]   The record contains only a description of the picture as opposed to the picture itself.   Additionally, the record does not reveal anything else about the white co-worker whose name was on the picture or the meaning of the picture.

---

[29] Def.'s Statement of Undisputed Facts (Doc. 26) ¶¶ 10, 12; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶¶ 10, 12.

[30] Smith Dep. (Doc. 36) at 61:7–22.

[31] Ex. 1 (Picture of President Obama and Speaker Pelosi) to Br. in Supp. of Pl.'s Resp. to Mot. for Summ. J. (Doc. 29-1).

[32] *Id.*

[33] Smith Dep. (Doc. 36) at 63:23–24.

[34] *Id.* at 63:23–64:8.

[35] *Id.*

[36] *Id.* at 64:9–12.

At first, only the Obama-Pelosi picture was on the window.[37]   Mr. Smith reported the presence of that picture to Judge Wheeless.[38]   In response, Judge Wheeless did not take personal action.[39]   Rather, he told Mr. Smith to take the complaint to his immediate supervisor, and Mr. Smith did so.[40]   The picture was not taken down immediately.[41]   Instead, the next day, the picture depicting the white couple had been added to the window near where the Obama-Pelosi picture remained.[42]   Some unknown number of days later—on December 12, 2019—Mr. Smith complained to Judge Wheeless that there were now two concerning pictures on the window.[43]   In response, Judge Wheeless "snatched them off the window."[44]

On the day the pictures were taken off the window, a co-worker of Mr. Smith used the N-word at a meeting.[45]   (The record does not give us any further detail about the co-worker's "use" of the word.)   It is unclear whether Mr. Smith was in that meeting.   But it is clear that Mr. Smith did not hear the employee use the slur.[46]   And there is no evidence that the slur was directed toward Mr. Smith or any other Black person.   Mr. Smith only learned that the employee

---

[37] *Id.* at 62:12–15.

[38] *Id.* at 62:6–9.

[39] *Id.*

[40] *Id.* at 62:3–24.

[41] *Id.* at 64:16–65:3.

[42] *Id.* at 62:10–15.

[43] *Id.* at 62:3–24, 64:25–65:3; Ex. 17 (Excerpts of Pl.'s Discovery Responses) to Mot. for Summ. J. (Doc. 24-17) at 2.   Although it is not clear exactly when, Mr. Smith reported the pictures to Justice Stacy Allen between the time he spoke to his direct supervisor and the second time he spoke to Judge Wheeless.   Smith Dep. (Doc. 36) at 62:25–63:2. When Justice Allen was told about the pictures, Justice Allen looked at the pictures, but did not take them down.   *Id.* at 63:3–12.   There is no evidence as to whether Justice Allen talked to anyone other than Mr. Smith (or did anything else) about the pictures.

[44] Smith Dep. (Doc. 36) at 62:12–15.

[45] *Id.* at 64:25–66:6.

[46] *Id.* at 65:4–13.   The racial slur was only said once.   *Id.*

used the slur later from other people in the workplace.[47]   When he learned of it, he and another colleague tried to call Judge Wheeless to report the incident.[48]   The judge did not answer the phone.[49]   Mr. Smith's colleague then used Mr. Smith's phone to call Justice Allen and report the incident.[50]   Justice Allen told Judge Wheeless to go to the Road Department shop.[51]   Judge Wheeless came to the shop and confirmed the use of the slur.[52]

In a second meeting later that same day, Judge Wheeless "stated that [the other employee] had admitted to him that he did say the N word."[53]   Also at that meeting, the employee in question said "something to the extent [of] . . . I did use the N word, and I know if I would have been anywhere else, I would have been terminated."[54]   Mr. Smith "think[s]" he "got out the [employee] handbook," noted the section that said "there was a zero tolerance for racist slurs[,]" and asked Judge Wheeless "what was his meaning of zero tolerance." [55]   Judge Wheeless did not substantively respond to Mr. Smith's point, but rather accused Mr. Smith of wanting to get the co-worker fired.[56]   The next day, the co-worker announced that he was going to quit.[57]   Mr. Smith

---

[47] *Id.* at 69:13–70:13.

[48] *Id.* at 69:20–70:2.

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Id.* at 65:12–25, 69:20–70:10.

[53] *Id.* at 65:15–17.

[54] *Id.* at 66:4–6.

[55] *Id.* at 66:8–14.

[56] *Id.*

[57] *Id.* at 66:22–23.

does not know whether the co-worker quit or was fired, but the co-worker stopped working there at that point in time.[58]

Fast forward to Mr. Loudermilk starting as the Crittenden County Road Supervisor. Shortly after taking this role, Mr. Loudermilk hired two new drivers: one Black driver and one white driver.[59]   At some point between February 1, 2020 and May 4, 2020, Mr. Smith sought information—by way of a FOIA request—about the pay of all County Road Department employees.[60]   It appears that Mr. Smith's purpose in doing so was (1) to learn what the two newly hired drivers were being paid,[61] and (2) to learn if white employees were generally being paid more than Black employees.[62]   The record does not contain any of the documents received in response to the FOIA request.   According to testimony, however, the documents that Mr. Smith received in response to his FOIA request showed:[63]

- the newly hired white driver was making twenty-five cents an hour more than the newly hired Black driver;[64]

- both newly hired drivers were making more than what the pay scale set by the Crittenden County Quorum Court recommended;[65]

- both newly hired drivers were being paid more than Mr. Smith was paid when he first started at the Road Department.[66]

---

[58] *Id.* at 66:24–67:4.

[59] Loudermilk Dep. (Doc. 37) at 14:24–15:15.

[60] *Id.* at 26:8–22; Smith Dep. (Doc. 36) at 72:5–14, 75:8–24.

[61] Smith Dep. (Doc. 36) at 73:18–24, 85:22–86:3.

[62] *Id.* at 113:1–5.

[63] The only reasonable inference a jury could make based on this record is that the information concerning pay differentials came from the documents Mr. Smith received in response to his FOIA request.   *See id.* at 9:16–23, 105:22–106:2.

[64] *Id.* at 85:22–86:3.

[65] *Id.* at 101:2–13.

[66] *Id.* at 87:3–6.   Mr. Smith, at the time of the FOIA request, was making more than either of the newly hired drivers. *Id.* at 86:23–87:2.

Moreover, while the evidence is incredibly scant, there is just enough testimony from Mr. Smith to support—at this stage—an inference that the records show white drivers were on average paid more than Black drivers.[67]

In any event, after receiving the documents, Mr. Smith sought to be put on the Crittenden County Quorum Court's agenda for its May 2020 meeting.[68]   One of the members of the Quorum Court put him on the agenda.[69]   The reasonable inference most favorable to Mr. Smith is that Mr. Smith sought to be on the agenda to talk about the pay differential he discovered and maybe race issues at the Department more generally.[70]   (The member of the Quorum Court who placed Mr. Smith on the agenda knew about the racial slur used by Mr. Smith's co-worker.[71])   There is no evidence that either Mr. Loudermilk or Judge Wheeless knew that Mr. Smith had been added to the Quorum Court's May agenda.[72]

At some unidentified point after Mr. Smith made the FOIA request but before May 4, 2020, Judge Wheeless directed Mr. Loudermilk to ask Mr. Smith why he had requested information regarding the County road workers' pay.[73]   Mr. Loudermilk did as instructed and told Mr. Smith that "it really ain't anybody's business what somebody makes."[74]   Mr. Loudermilk then said that

---

[67] *Id.* at 73:18–24, 84:19–24, 85:22–86:3, 90:6–16, 100:16–102:3.

[68] *Id.* at 9:19–23, 84:12–15.

[69] *Id.* at 143:25–144:17.

[70] *Id.* at 84:13–15; 101:2–13; 144:9–17.

[71] *Id.* at 143:25–144:12.

[72] *Id.* at 84:16–18.

[73] *Id.* at 74:23–75:9.

[74] *Id.*; Loudermilk Dep. (Doc. 37) at 26:15–17.

Mr. Smith would be fired if he "ke[pt] it up[.]"[75]   Mr. Smith was not aware if a white employee had ever been questioned about a FOIA request.[76]

### B.   The May 4, 2020 Meetings and Subsequent Events

On May 4, 2020, there was a Road Department meeting with Judge Wheeless and Mr. Loudermilk in attendance.[77]   During this meeting, Mr. Smith asked if a white driver, who had recently been in a car accident on the job, had been drug tested after the accident.[78]   Mr. Smith was told that the driver had not taken a drug test.[79]   This violated County policy.[80]   After the meeting, the driver was sent by Mr. Loudermilk to take a drug test.[81]   Mr. Loudermilk had not sent the driver for a drug test previously because Mr. Loudermilk mistakenly thought the applicable policy only required drug testing if the accident involved bodily injury.[82]   There is no evidence that Mr. Smith complained at this meeting that Black drivers were getting drug tested after accidents while white drivers were not.   (There is evidence Mr. Smith believed this is what was going on, just not evidence that he shared his belief aloud.[83])

---

[75] Smith Dep. (Doc. 36) at 73:6–8.   This version of events is disputed.   Crittenden County has put forth evidence showing that Mr. Loudermilk took issue with Mr. Smith's FOIA request because Mr. Smith had made the request during working hours.   Loudermilk Dep. (Doc. 37) at 26:12–22.

[76] Smith Dep. (Doc. 36) at 73:25–74:2.

[77] Def.'s Statement of Undisputed Facts (Doc. 26) ¶ 17; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 17.   Paragraph 17 of Crittenden County's Statement of Undisputed Facts does say that the meeting took place on May 4, 2022, but this is clearly a scrivener's error.   All other evidence in the record states that the meeting took place on May 4, 2020.   *See e.g.,* Ex. 5 (Termination Letter) to Mot. for Summ. J. (Doc. 24-5).

[78] Smith Dep. (Doc. 36) at 70:14–71:16.

[79] *Id.*   Mr. Smith had previously been in a car accident on the job and was told to immediately take a drug test after the accident.   *Id.* at 95:6–9.

[80] *Id.* at 96:3–7; Loudermilk Dep. (Doc. 37) at 34:5–20.

[81] Loudermilk Dep. (Doc. 37) at 34:14–20, 35:22–36:2.

[82] *Id.* at 34:12–20.

[83] Smith Dep. (Doc. 36) at 61:7–14, 70:14–71:16; Ex. 1 (EEOC Charge of Discrimination) to Am. Compl. (Doc. 12-1).

Subsequent to the meeting, Mr. Smith told Mr. Loudermilk that he would like to speak with him and Judge Wheeless.[84]  Mr. Loudermilk relayed the message to Judge Wheeless, and the three of them got together in the shop's lobby.[85]  Mr. Smith asked Judge Wheeless why he had directed Mr. Loudermilk to confront Mr. Smith about the FOIA request.[86]  Judge Wheeless responded by telling Mr. Smith that Mr. Smith "had no right to do that."[87]  Mr. Smith then said, "the Supreme Court said I had a right to request . . . that information."[88]  Mr. Smith and Judge Wheeless also discussed Mr. Smith's "work habits and inattention to [Mr. Smith's] work duties[.]"[89]  Mr. Smith told Judge Wheeless that Mr. Smith could be on his phone any time he wanted to be.[90]  Toward the end of the meeting, Judge Wheeless told Mr. Smith that if he was unhappy then he should find another job.[91]  It seems that much more was said at the meeting, but the record does not contain any evidence regarding what else was said.[92]

---

[84] Loudermilk Dep. (Doc. 37) at 17:13–19.

[85] *Id.*; Smith Dep. (Doc. 36) at 74:16–22.

[86] Smith Dep. (Doc. 36) at 74:23–75:13.  Mr. Smith recorded a video of the entire meeting.  *Id.* at 83:5–10.  And Mr. Smith stated in his Complaint that the video was "available for review by the Defense as well as the Court."  Am. Compl. (Doc. 12) at 3.  But neither Mr. Smith nor the County ever made the recording part of the record.  Discovery closed on March 10, 2023.  Final Scheduling Order (Doc. 21) at 1.  Summary judgment briefing ended on May 1, 2023.  A summary judgment hearing was held on August 22, 2023.  Well after all this, the Court inquired of both parties—in an April 3, 2024 email—whether the video had been made part of the record and, if not, whether the video should be made part of the record.  On April 4, 2024, Mr. Smith responded with a link to a SharePoint file where the video could be viewed.  But he did not answer the Court's question of whether the video was already part of the record.  Crittenden County responded six minutes later and stated that the video had not been made part of the record and argued that the video should not be made part of the record at this late stage because "the time for responding to dispositive motions has passed."  Because Mr. Smith failed to respond to the Court's question regarding whether the video was already part of the record, the Court assumes that Crittenden County is correct that the video is not currently part of the record.  Crittenden County is also correct that the time to respond to dispositive motions has long since passed.  Accordingly, the video is not part of the record, and the Court will not consider the video for purposes of ruling on Crittenden County's Motion for Summary Judgment.

[87] Smith Dep. (Doc. 36) at 75:15.

[88] *Id.* at 75:22–24.

[89] *Id.* at 122:5–24.

[90] Loudermilk Dep. (Doc. 37) at 19:9–20:6.

[91] *Id.* at 18:18–21.

[92] *Id.* at 19:9–19; Smith Dep. (Doc. 36) at 75:25–76:4; *see supra* note 86 for discussion concerning why the video of

During the conversation, Mr. Smith, Mr. Loudermilk, and Judge Wheeless all used profanity and raised their voices.[93]   Mr. Smith's profanity was limited to the word "damn," while Mr. Loudermilk used "the MF word" and Judge Wheeless used the word "ass."[94]   Mr. Smith directed his profanity toward Mr. Loudermilk and Judge Wheeless.[95]   Judge Wheeless's and Mr. Loudermilk's profanity were directed toward Mr. Smith.[96]   At no time did Mr. Loudermilk direct his profanity toward Judge Wheeless.[97]   During the meeting, Mr. Smith exhibited threatening body language, which included jumping out of his chair and beating his chest.[98]   The parties eventually agreed to part ways before things got out of control.[99]   After the meeting, Mr. Loudermilk followed Mr. Smith into the shop's parking lot and told Mr. Smith that "we can't

---

the meeting between Mr. Smith, Mr. Loudermilk, and Judge Wheeless cannot be used to supplement the deficiencies in the record.

[93] Loudermilk Dep. (Doc. 37) at 41:23–42:3; *see also* Br. in Supp. of Pl.'s Resp. to Mot. for Summ. J. (Doc. 29) at 6 (Mr. Smith conceding that he used profanity); Aug. 22, 2023 Hr'g Tr. (Rough) at 9:55:38–9:56:16 (same).

[94] Smith Dep. (Doc. 36) at 80:5–81:1.

[95] Def.'s Statement of Undisputed Facts (Doc. 26) ¶ 21; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 21.   Even though Mr. Smith denied paragraph 21, the evidence he cites to merely points out that all three individuals used profanity during the meeting.   Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 21.   Mr. Smith does not deny that Mr. Smith used profanity toward his immediate supervisor and toward Judge Wheeless.   *Id.* Indeed, as noted in footnote 93, *supra*, he admits it in his summary judgment briefing.

[96] Loudermilk Dep. (Doc. 37) at 20:11–21:3, 42:16–18.

[97] Def.'s Statement of Undisputed Facts (Doc. 26) ¶ 22; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 22.

[98] Def.'s Statement of Undisputed Facts (Doc. 26) ¶ 20; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 20.   Although Mr. Smith denies paragraph 20 of Crittenden County's Statement of Undisputed Facts, he does not do so properly.   The paragraph in question reads, "[a]s the discussion progressed, 'it got heated,' . . . with [Mr.] Smith exhibiting 'threatening style body language,' including 'jump[ing] up out of his chair, and . . . beating his chest.'"   Def.'s Statement of Undisputed Facts (Doc. 26) ¶ 20.   In response, Mr. Smith only points out that Crittenden County omitted the behavior of Mr. Loudermilk and Judge Wheeless in this interaction.   Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 20.   This response fails to challenge Crittenden County's statements regarding Mr. Smith's actions during the meeting.   This failure serves as an admission to paragraph 20 of Crittenden County's Statement of Undisputed Facts. *See* Local Rule 56.1(c).

[99] Def.'s Statement of Undisputed Facts (Doc. 26) ¶ 23; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 23.

have these kind of blow-ups[.]"[100]   Mr. Loudermilk then told Mr. Smith to go home if he was too

upset to work.[101]   Mr. Smith went home.[102]

      Two days later, Mr. Loudermilk issued Mr. Smith two Employee Warning Reports.[103]

Such warnings are issued to help employees know what they need to work on.[104]   Mr. Loudermilk

issued Mr. Smith the first warning because Mr. Loudermilk claimed that Mr. Smith was asleep on

the job.[105]   Mr. Smith disagrees and says he was never asleep.[106]   Mr. Loudermilk issued

Mr. Smith the second warning because he was sitting in his personal car during work hours.[107]

But Mr. Smith says that he went to his car to get eye drops because he got something in his eye

while mowing grass, and that Mr. Loudermilk never asked Mr. Smith why he was sitting in the

car.[108]

      The warnings do not appear to carry any direct or indirect consequences for an employee.

Crittenden County does not take adverse action because of these kinds of warnings.[109]

---

[100] Def.'s Statement of Undisputed Facts (Doc. 26) ¶ 25; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 25.

[101] Def.'s Statement of Undisputed Facts (Doc. 26) ¶ 26; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 26.

[102] Def.'s Statement of Undisputed Facts (Doc. 26) ¶ 27; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 27.

[103] Ex. 6 (Warning Report for Sleeping) to Mot. for Summ. J. (Doc. 24-6); Ex. 7 (Warning Report for Sitting in Personal Car) to Mot. for Summ. J. (Doc. 24-7).

[104] Loudermilk Dep. (Doc. 37) at 41:1–15; Def.'s Statement of Undisputed Facts (Doc. 26) ¶ 30; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 30.   Mr. Smith denies paragraph 30, but he does not cite to any evidence in the record to support his denial. Instead, he says that the Employee Warning Reports "speak for themselves" and that Mr. Loudermilk's interpretation of the warnings is "wholly irrelevant to this case."   Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 30.   The Employee Warning Reports do not "speak for themselves" when it comes to the facts described in paragraph 30, so Mr. Smith's lacking response serves as an admission.   *See* Local Rule 56.1(c).

[105] Ex. 6 (Warning Report for Sleeping) to Mot. for Summ. J. (Doc. 24-6).

[106] Smith Dep. (Doc. 36) at 109:14–112:11.

[107] Ex. 7 (Warning Report for Sitting in Personal Car) to Mot. for Summ. J. (Doc. 24-7).

[108] Smith Dep. (Doc. 36) at 107:10–108:14.

[109] Loudermilk Dep. (Doc. 37) at 41:1–15; Def.'s Statement of Undisputed Facts (Doc. 26) ¶ 30; Pl.'s Resp. to Def.'s

Mr. Smith's pay was not cut as a result of these warnings.[110]   Other than these two warnings—and some conversations with Mr. Smith about cell phone usage and "talking to the courthouse" during work hours—Mr. Loudermilk did not take any further disciplinary action against Mr. Smith.[111]

On May 11, 2020—one week after the "blowup" meeting—Judge Wheeless sent Mr. Smith a termination letter informing Mr. Smith that he had been fired for being "belligerent and verbally abusive and insubordinate to [Judge Wheeless] and [Mr. Smith's] supervisor."[112]   The letter informed Mr. Smith that he had a right to a grievance hearing.[113]   Mr. Smith chose to exercise that right.[114]   On May 14, 2020, a hearing was held in front of the Grievance Committee.[115]   The Committee decided to recommend a two-week suspension instead of termination.[116]   Judge Wheeless took the Committee's recommendation into consideration, ultimately deciding to suspend Mr. Smith for three weeks without pay instead of terminating him.[117]   Mr. Smith returned from his suspension on June 1, 2020.[118]

---

Statement of Undisputed Facts (Doc. 30) ¶ 30.   As noted in footnote 104, *supra*, although Mr. Smith denies paragraph 30, he does so improperly.   His lacking response serves as an admission.   *See* Local Rule 56.1(c).

[110] Smith Dep. (Doc. 36) at 108:15–20.

[111] Def.'s Statement of Undisputed Facts (Doc. 26) ¶ 31; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 31.

[112] Ex. 5 (Termination Letter) to Mot. for Summ. J. (Doc. 24-5).

[113] *Id.*

[114] Ex. 8 (Grievance Hr'g Req.) to Mot. for Summ. J. (Doc. 24-8).

[115] Ex. 9 (Grievance Hr'g Agenda) to Mot. for Summ. J. (Doc. 24-9).

[116] Ex. 10 (Suspension Letter) to Mot. for Summ. J. (Doc. 24-10).

[117] *Id.*

[118] Def.'s Statement of Undisputed Facts (Doc. 26) ¶¶ 35–36; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶¶ 35–36.

From June 2020 to October 2020, Mr. Smith continued to work as a truck driver for Crittenden County, but his duties changed somewhat.[119]  Instead of working with others in the Road Department, Mr. Smith was tasked with "spraying" county roads by himself.[120]  The job entailed driving slowly on the side of the road while spraying chemicals.[121]  The job did not involve any hands-on work other than mixing the chemicals and cleaning the spraying nozzle.[122]  Mr. Smith chose to stop working for the Road Department in October of 2020 because he was always working by himself.[123]  Mr. Smith believes that his constant solo assignments constituted a hostile work environment.[124]

### III. LEGAL ANALYSIS

Within each category of the claims in this case—disparate treatment, retaliation, and hostile work environment—the same liability standards apply whether the particular claim is being analyzed under ACRA or under § 1981.[125]  And here, where there is no direct evidence of unlawfulness, the *McDonnell-Douglas* framework governs the Court's evaluation of all the claims.[126]  Under this rubric, all the claims fail.

---

[119] Smith Dep. (Doc. 36) at 125:17–128:3.

[120] *Id.*

[121] *Id.* at 129:5–22.

[122] *Id.* at 129:13–15.

[123] *Id.* at 127:21–128:3.

[124] *Id.*

[125] *See McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 860 (8th Cir. 2009); *Davis v. KARK-TV, Inc.*, 421 F.3d 699, 703–04 (8th Cir. 2005).

[126] *See Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1046 (8th Cir. 2005); *Erenberg v. Methodist Hosp.*, 357 F.3d 787, 792 (8th Cir. 2004); *Kim*, 123 F.3d at 1056.  Mr. Smith agreed at the summary judgment hearing that his claims should be analyzed using the *McDonnell-Douglas* framework.  Aug. 22, 2023 Hr'g Tr. (Rough) at 10:10:41– 10:11:01.  The Court has some difficulty in understanding why hostile work environment claims should be analyzed using the *McDonell-Douglas* framework.  But the Eighth Circuit precedent is clear that the framework applies even to those claims.  *See, e.g.*, *Erenberg*, 357 F.3d at 792.

### A.  The § 1981 and ACRA Disparate Treatment Claims

To establish a prima facie case on his disparate treatment claims, Mr. Smith must provide evidence from which a reasonable jury could conclude that: "(1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination[.]"[127]  Crittenden County does not dispute that Mr. Smith, a Black man, is part of a protected class.[128]  And Crittenden County admits it took adverse action insofar as it suspended Mr. Smith for three weeks without pay.[129]  That takes care of prongs 1 and 3.

As for prong 2, Mr. Smith has done enough.  Crittenden County makes a half-hearted argument that Mr. Smith was not meeting the County's legitimate job expectations because, as described in the Employee Warning Reports, Mr. Smith was sitting in his personal car during work hours and was falling asleep on the job.[130]  But "the two write ups had no disciplinary

---

[127] *Young v. Builders Steel Co.*, 754 F.3d 573, 577 (8th Cir. 2014) (quotation marks and citation omitted).

[128] Br. in Supp. of Mot. for Summ. J. (Doc. 25) at 18.

[129] Def.'s Statement of Undisputed Facts (Doc. 26) ¶ 34; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 34.  *See McClure v. Career Sys. Dev. Corp.*, 447 F.3d 1133, 1137 (8th Cir. 2006).  Crittenden County's issuance of the Employee Warning Reports to Mr. Smith on May 6, 2020, did not constitute adverse action because their issuance did not change the "compensation, terms, conditions, or privileges" of Mr. Smith's employment.  *See Muldrow v. City of St. Louis, Mo.*, 144 S. Ct. 967, 975 (2024) (quotation marks and citation omitted); Def.'s Statement of Undisputed Facts (Doc. 26) ¶ 30; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 30.  Following the Supreme Court's decision in *Muldrow*, it is not clear whether Mr. Smith's post-suspension work assignment constituted adverse action.  The Supreme Court held that, in order to satisfy the 3rd prong of the prima facie disparate treatment standard, the plaintiff must show "some harm respecting an identifiable term or condition of employment." *Muldrow*, 144 S. Ct. at 974.  It's uncertain exactly what the Supreme Court means by "some harm."  *See id.* at 979 (Alito, J., concurring).  Justice Thomas's concurrence suggests that the "some harm" standard requires the plaintiff to show "more than a trifling harm."  *See id.* at 977 (Thomas, J., concurring).  On the other hand, Justice Kavanaugh, in his concurrence, argues that the "some harm" requirement merely requires the plaintiff to show any adverse change to "money, time, satisfaction, schedule, convenience, commuting costs or time, prestige, status, career prospects, interest level, perks, professional relationships, networking opportunities, effects on family obligations, or the like." *Id.* at 980 (Kavanaugh, J., concurring).  In any event, Mr. Smith's Amended Complaint does not include any alleged facts to suggest Mr. Smith was pursuing a disparate treatment claim based on his post-suspension work assignment, so the Court need not resolve the question here.  Am. Compl. (Doc. 12).

[130] Br. in Supp. of Mot. for Summ. J. (Doc. 25) at 20; Ex. 6 (Warning Report for Sleeping) to Mot. for Summ. J. (Doc. 24-6); Ex. 7 (Warning Report for Sitting in Personal Car) to Mot. for Summ. J. (Doc. 24-7).

consequence[.]"[131]   Moreover, after serving his suspension, Mr. Smith was welcomed back to the Road Department in the same role.[132]   This alone is enough for a reasonable jury to conclude that Mr. Smith was meeting the legitimate expectations of his employer when the adverse action took place.[133]

On this record, the real problem for Mr. Smith is the fourth prong of the prima facie case. Generally, the fourth prong requires a plaintiff employee to provide evidence that a defendant employer "(1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision."[134]   These three categories of evidence are not an exhaustive list of the ways in which a plaintiff employee can raise an inference of discrimination.[135]   But they are the usual suspects.   In any event, in this case, Mr. Smith puts all his eggs in the disparate-treatment-of-similarly-situated-employees basket.[136] And, even on the most pro-Plaintiff read of this record, he does not have any facts to support such an argument.

Recall that Mr. Smith was terminated for being "belligerent and verbally abusive and insubordinate to [Judge Wheeless] and [Mr. Loudermilk][.]"[137]   Mr. Smith does not point to other

---

[131] Br. in Supp. of Mot. for Summ. J. (Doc. 25) at 20 n.4.

[132] Def.'s Statement of Undisputed Facts (Doc. 26) ¶ 36; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 36; Smith Dep. (Doc. 36) at 126:3–5.

[133] *See Lixin Liu v. BASF Corp.*, 409 F. App'x 988, 991 (8th Cir. 2011) (holding that the plaintiff met his employer's legitimate expectations because he was qualified for the position at the time the adverse action was taken).

[134] *Young*, 754 F.3d at 578 (quotation marks and citation omitted).

[135] *See id.*

[136] Br. in Supp. of Pl.'s Resp. to Mot. for Summ. J. (Doc. 29) at 6 ("In that meeting[,] there were three participants. All three used profanity, all three had raised voices, but only one member of the meeting was African-American.   It was the African-American who was disciplined[.]"); *id.* at 11 ("It is undisputed that the Plaintiff's behavior mirrored that of his two white supervisors, who received no discipline."); *id.* at 12 ("[W]orst of all[,] he raised his voice to white men who were doing the very same to him.").

[137] Ex. 5 (Termination Letter) to Mot. for Summ. J. (Doc. 24-5); Ex. 10 (Suspension Letter) to Mot. for Summ. J. (Doc. 24-10).

employees on his level that (1) acted similarly, and (2) received no or less discipline.   Instead, he points to the actions of his superiors—Mr. Loudermilk and Judge Wheeless—in the May 4 meeting.   Mr. Smith's point seems to be that they too used profanity and raised their voices, but they were not disciplined for it.[138]   There is a fatal flaw in this logic.   Mr. Smith is not similarly situated to Mr. Loudermilk or Judge Wheeless.   Although Mr. Loudermilk and Judge Wheeless used profanity and raised their voices, their behavior was not directed toward a supervisor.[139] Instead, their behavior was directed toward a subordinate.   Mr. Smith's behavior, contrastingly, was directed toward his supervisors. [140]   The supervisor-to-subordinate vs. subordinate-to-supervisor distinction defeats any inference of discrimination that might otherwise arise from the failure to discipline Mr. Loudermilk or Judge Wheeless for their conduct in the May 4 meeting. Accordingly, because Mr. Smith failed to provide any examples of a white employee acting similarly to the way Mr. Smith acted toward his supervisors at the May 4 meeting,[141] Mr. Smith has failed to raise an inference of discrimination.

Even if the Court were to look elsewhere for an inference of discrimination—and it is not clear why the Court should do so given how Mr. Smith briefed his argument—the record does not contain evidence from which a reasonable jury could find such an inference.   Mr. Smith emphasizes that a co-worker once used the N-word.[142]   But that co-worker either quit or was fired

---

[138] Br. in Supp. of Pl.'s Resp. to Mot. for Summ. J. (Doc. 29) at 6–7, 11–12.

[139] Def.'s Statement of Undisputed Facts (Doc. 26) ¶ 22; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 22.

[140] Def.'s Statement of Undisputed Facts (Doc. 26) ¶ 21; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 21.

[141] Smith Dep. (Doc. 36) at 81:2–7.

[142] *Id.* at 61:3–14.

the very next day.[143]   Mr. Smith also emphasizes that two pictures with racial overtones were placed on a window at the Road Department.[144]   But that was many months before the suspension at issue in this case.[145]   Mr. Loudermilk wasn't even at the Road Department then.[146]   And the evidence doesn't suggest Judge Wheeless acted improperly; he first directed Mr. Smith to take the complaint to Mr. Smith's immediate supervisor and then, when he learned the pictures had not been removed, he took them down himself.[147]   Finally, Mr. Smith emphasizes that he was looking into disparate pay between white and Black truck drivers.[148]   In theory, that might raise an inference that his suspension was retaliation for looking into the pay issue (more on that point later).   But it doesn't raise the inference that he was suspended because he was Black.[149]

Crittenden County is entitled to judgment as a matter of law on the disparate treatment claims.

### B. The § 1981 and ACRA Hostile Work Environment Claims

To establish a prima facie hostile work environment claim, Mr. Smith must demonstrate that: "(1) [Mr. Smith] is a member of a protected group; (2) [he] was subject to unwelcome race-based harassment; (3) the harassment was because of membership in the protected group; and (4)

---

[143] *Id.* at 66:21–67:4.

[144] *Id.* at 61:3–14.

[145] Ex. 17 (Excerpts of Pl.'s Discovery Responses) to Mot. for Summ. J. (Doc 24-17) at 2.

[146] Def.'s Statement of Undisputed Facts (Doc. 26) ¶ 7; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 7.

[147] Smith Dep. (Doc. 36) at 62:3–24.

[148] *Id.* at 113:1–5.

[149] The fact that white truck drivers were being paid more than Black truck drivers—a fact the Court must accept at summary judgment despite the lack of documentary evidence on the point—does not on its own suggest Mr. Smith's suspension was because of his race.   The two types of purported discrimination are not close enough in kind for that inferential step to be made.

the harassment affected a term, condition, or privilege of employment."[150]  Almost all of the action in hostile work environment cases occurs at prong 4 of this prima facie test.

For harassment to affect a term, condition, or privilege of employment, the harassment must be "sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment."[151]  This is a high threshold, and Eighth Circuit precedent strictly enforces it.  The conduct must be extreme, not just rude or unpleasant.[152]  "Allegations of a few isolated or sporadic incidents will not suffice[.]"[153]  Rather, Mr. Smith must show that the harassment was "so intimidating, offensive, or hostile that it poisoned the work environment."[154]

Mr. Smith has not provided any evidence from which a reasonable jury could conclude that the Eighth Circuit's high threshold has been met.  The Obama-Pelosi picture put on the window, while in poor taste, was not about race.[155]  As the Eighth Circuit has repeated many times over, the discrimination laws are not intended to be a civility code.[156]  The second picture—of the white man, white woman, black dog, and mixed-race baby—was obviously racial in nature.[157]  But it was quite clearly targeted toward someone other than Mr. Smith (i.e., a white co-worker).[158]  And, as soon as Mr. Smith complained about the second picture to Judge Wheeless, Judge Wheeless

---

[150] *Clay v. Credit Bureau Enters., Inc.*, 754 F.3d 535, 540 (8th Cir. 2014) (quoting *Malone v. Ameren UE*, 646 F.3d 512, 517 (8th Cir. 2011).

[151] *Nitsche v. CEO of Osage Valley Elec. Co-op.*, 446 F.3d 841, 845 (8th Cir. 2006) (quotation marks and citation omitted).

[152] *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 618 (8th Cir. 2007) (quoting *Nitsche*, 446 F.3d at 846).

[153] *Id.* (quoting *Tuggle v. Mangan*, 348 F.3d 714, 720 (8th Cir. 2003)).

[154] *Id.* (quoting *Tuggle v. Mangan*, 348 F.3d 714, 720 (8th Cir. 2003)).

[155] Ex. 1 (Picture of President Obama and Speaker Pelosi) to Br. in Supp. of Pl.'s Resp. to Mot. for Summ. J. (Doc. 29-1).

[156] *See Wallin v. Minn. Dep't of Corr.*, 153 F.3d 681, 688 (8th Cir. 1998); *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 721 (8th Cir. 2003).

[157] Smith Dep. (Doc. 36) at 63:23–64:12.

[158] *Id.*

took it down.[159]   The use of the N-word is certainly concerning.   But it was one time, was not directed toward Mr. Smith, was not heard by Mr. Smith, and resulted in either the offending employee quitting or being terminated the day after he used the slur.[160]   None of the foregoing is appropriate for the workplace.   But none of it rises to the level of severe and pervasive harassment of Mr. Smith.

That's true even when the foregoing is combined with other conduct Mr. Smith highlights. For example, Mr. Smith felt harassed when Mr. Loudermilk asked Mr. Smith why Mr. Smith had requested information regarding his co-workers' pay.[161]   But Mr. Smith's feeling of harassment arose from Mr. Smith's view that the law prevented Mr. Loudermilk from inquiring about Mr. Smith's FOIA request.[162]   He doesn't suggest Mr. Loudermilk yelled at him, physically touched him, physically intimidated him, or anything like that.[163]   At most, he says that Mr. Loudermilk suggested Mr. Smith could be fired if he kept up his FOIA requests.[164]   That's not harassment in the language of a hostile work environment claim.

Mr. Smith also points to the May 4, 2020 meeting with Mr. Loudermilk and Judge Wheeless, where all parties raised their voices and used profanity.[165]   As explained above, Mr. Smith did not make the recording of the meeting part of the record.[166]   And the deposition testimony about the meeting would not allow a reasonable jury to conclude that either Judge

---

[159] *Id.* at 62:3–24.

[160] *Id.* at 65:4–67:4.

[161] *Id.* at 72:5–73:15.

[162] *Id.*

[163] *Id.*

[164] *Id.*

[165] *Id.* at 79:7–19.

[166] *See supra* note 86.

Wheeless or Mr. Loudermilk did anything that reached the level of severe and pervasive harassment.   The few uses of profanity and yelling in this single meeting—at least in the way described by Mr. Smith—was nowhere near the line of harassment.[167]   That doesn't mean it was nice.   That doesn't mean it was good.   It just wasn't so awful as to count as creating a hostile work environment.

Lastly, Mr. Smith alleges his post-suspension work assignment created a hostile work environment.[168]   After Mr. Smith returned from his suspension, he was assigned to spray roads by himself.[169]   He says the work was lonely and the solo assignment made his working environment abusive.[170]   But the fact that a job assignment is a solo assignment is not indicative of the type of abuse that underlies a hostile work environment claim.   There's no evidence the job was particularly tough, or had long hours, or was dangerous, or anything like that.[171]   While the new assignment could in theory form the basis of a discrimination or retaliation claim, it's not bad enough to be harassment.[172]

In sum, all the foreoing actions taken together fail to establish harassment that was so pervasive and so severe that it poisoned the work environment.[173]   Being asked questions by a supervisor, being reprimanded by a supervisor (even if the reprimand is accompanied by raised voices and

---

[167] Smith Dep. (Doc. 36) at 80:5–81:1.

[168] *Id.* at 126:3–128:5.

[169] *Id.* at 126:8–20.

[170] *Id.* at 127:21–128:5.

[171] *Id.* 129:5–22.

[172] It is almost not worth mentioning, but Mr. Smith also points to the two Employee Warning Reports he was given as evidence of harassment.   Smith Dep. (Doc. 36) at 105:13–17.   No consequences were attached to these reports. Def.'s Statement of Undisputed Facts (Doc. 26) ¶ 30; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶ 30.   There's not much to say about the reports except they don't really add anything to the mix with respect to the hostile work environment claims.

[173] *See Nitsche*, 446 F.3d at 846.

profanity), and working a job that one does not enjoy are all "ordinary tribulations of the workplace[.]"[174]   The single use of the N-word and the posting of a racially offensive picture were isolated incidents, and there is no evidence that these incidents were directed toward Mr. Smith.[175]   Mr. Smith has failed to establish that any harassment at the Road Department was frequent, physically threatening, or humiliating to the extent required by Eighth Circuit precedent.[176]   The hostile work environment claims cannot survive.

### C.   *The § 1981 and ACRA Retaliation Claims*

We start, as usual, with the prima facie test.   At this stage, Mr. Smith must provide evidence from which a reasonable jury could conclude that: (1) "he . . . engaged in a statutorily protected activity"; (2) "an adverse employment action was taken against him"; and (3) "a causal connection exists between the two events."[177]   No one disputes that prong 2 has been met because Mr. Smith was suspended.[178]   The parties do, however, dispute prongs 1 and 3.[179]

Prong 1 examines whether a plaintiff engaged in statutorily protected activities.[180]   There are two types of statutorily protected activities under § 1981 and ACRA: (1) "oppos[ing] any

---

[174]  *See id.* at 845.

[175]  Smith Dep. (Doc. 36) at 63:17–64:15, 65:4–66:6.

[176]  *See Nitsche*, 446 F.3d at 846.

[177]  *Gilooly v. Mo. Dep't of Health & Senior Servs.*, 421 F.3d 734, 739 (8th Cir. 2005).

[178]  Br. in Supp. of Mot. for Summ. J. (Doc. 25) at 19.   There are some Eighth Circuit cases that suggest a suspension with pay is not an adverse action.   *See e.g.*, *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 891–92 (8th Cir. 2005). It is unlikely that such cases survive *Muldrow*.   *See* 144 S. Ct. at 974 (holding that a Title VII plaintiff only needs to show "some harm respecting an identifiable term or condition of employment").   In any event, Mr. Smith's suspension was without pay.   Ex. 10 (Suspension Letter) to Mot. for Summ. J. (Doc. 24-10).   A suspension without pay is an adverse action.   *See McClure*, 447 F.3d at 1137.

[179]  Br. in Supp. of Mot. for Summ. J. (Doc. 25) at 25–27.   Although Crittenden County did not specifically argue that Mr. Smith did not engage in protected activity, the Court takes the County's general assertion that Mr. Smith "cannot make a *prima facie* case of retaliation" as disputing all elements of the prima facie retaliation claims that it did not already concede.   *Id.* at 26.

[180]  *See Gilooly*, 421 F.3d at 739.

practice made unlawful by Title VII," and (2) "ma[king] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under the statute."[181] Since no Title VII investigation ever took place, only the first kind of protected activity is in play.[182]  As to that type of protected activity, Mr. Smith argues that several things he did constitute protected activity.[183]  If any of the activities asserted by Mr. Smith (and supported by some evidence) count as protected activity, prong 3 then requires the Court to analyze whether Mr. Smith has provided any evidence to show a causal relationship between that activity and the suspension he received.[184]

Most forcefully, Mr. Smith says that his FOIA request concerning truck driver pay counts as protected activity.[185]  That is not correct.   The FOIA request itself was, at most, an example of Mr. Smith privately investigating whether the County had engaged in unlawful discrimination. But an employee's private investigation is not the type of "opposition" that counts as protected activity.   As the Sixth Circuit has noted, "[t]he opposition clause . . . covers conduct such as 'complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices[,] refusing to obey an order because the worker thinks it is unlawful under Title VII[,] and opposing unlawful acts by persons other than the employer—e.g., former employers, union, and co-workers."[186]   Mr. Smith's FOIA request was none of these things.

---

[181] *Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 684 (8th Cir. 2012) (quotation marks and citation omitted); *see also Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028 (8th Cir. 2002).

[182] *See McConnell v. Mayorkas*, No. 5:22-cv-05071, 2023 WL 5025009, at *4 (W.D. Ark. Aug. 7, 2023) (refusing to expand Title VII's protection under the participation clause to an employee's personal investigation of discrimination).

[183] Br. in Supp. of Pl.'s Resp. to Mot. for Summ. J. (Doc. 29) at 5–8, 12.

[184] *See Gilooly*, 421 F.3d at 739.

[185] Smith Dep. (Doc. 36) at 75:15–76:13.

[186] *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008) (quotation marks and citation omitted).

The request itself did not report or complain about discrimination.   The request itself was not a refusal of an order.   The request itself did not try to stop something a co-worker or former co-worker did or was doing.   The definition of "opposition" may be broad, but it is not broad enough to include the making of a FOIA request on the theory that the documents obtained might show discrimination.   The Supreme Court teaches us that the term "oppose" should "carr[y] its ordinary meaning[.]"[187]   Without belaboring the point, no reasonable person would say an employee "opposed" an act of discrimination by making a FOIA request to see whether any discrimination was occurring in the first place.[188]

In any event, even if somehow the FOIA request could be considered cognizable "opposition"—because of Mr. Smith's purpose in making the request—Mr. Smith has provided no evidence from which a reasonable jury could find prong 3 (the causal link prong) satisfied. For an employer to take adverse action against an employee "because of" said employee's protected activity, the employer needs to at least suspect that the employee took protected activity.[189]   Here, although Mr. Loudermilk and Judge Wheeless knew of the FOIA request, there is no evidence that they knew or even suspected Mr. Smith's purpose in making the request was to look for evidence of racially discriminatory pay.   And there is no evidence that Mr. Smith shared with them any information about what the responsive documents showed, either generally

---

[187] *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009).

[188] *See id.* (defining "oppose" as meaning "[t]o resist or antagonize . . .; to contend against; to confront; resist; withstand") (quotation marks and citation omitted).

[189] *See Wolff v. Berkley Inc.*, 938 F.2d 100, 103 (8th Cir. 1991) ("Such a causal link does not exist if the employer is not aware of the employee's statutorily protected activity."); *Chacko v. DynAir Servs., Inc.*, 272 F. App'x 111, 113 (2d Cir. 2008) ("[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII.") (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)).

or specifically with respect to race issues.[190]   As such, there is no evidence that Judge Wheeless

or Mr. Loudermilk were aware that Mr. Smith had engaged in protected activity.

Mr. Smith's second assertion of protected activity is getting himself placed on the

Crittenden County Quorum Court's May agenda—possibly to discuss the pay of the newly hired

drivers.[191]   There is some evidence that he was put on the agenda to discuss one or more issues of

alleged race discrimination.[192]   The Court assumes for purposes of this analysis that placement on

the agenda just chins the bar of protected activity.   (Actual speaking against alleged instances of

discrimination at the meeting would of course count as protected activity.)   Still, for much the

same reason as the Court already discussed with respect to the FOIA request, Mr. Smith can't

make out a prima facie case.

Specifically, he has failed to provide any evidence from which a reasonable jury could find

a causal connection between his addition to the Crittenden County Quorum Court's May agenda

and his suspension.   Mr. Smith did not provide any evidence that Mr. Loudermilk or Judge

Wheeless were aware that he was added to Quorum Court's May agenda.[193]   Because there is

nothing to show Mr. Loudermilk or Judge Wheeless knew or suspected Mr. Smith had been added

to the Quorum Court agenda or that he was going to speak about race discrimination issues, this

protected activity cannot be causally linked to the suspension.

For his third purportedly protected activity, Mr. Smith points to the May 4, 2020, meeting

that involved the entire shop department.   Recall that, in the meeting, Mr. Smith asked whether a

---

[190] Smith Dep. (Doc. 36) at 73:4–24, 77:9–78:7.

[191] *Id.* at 84:13–15, 85:22–86:3, 144:9–17.

[192] *Id.* at 144:4–24.

[193] *Id.* at. 84:16–18.

truck driver who had recently been in an accident had taken a drug test after the accident.[194]

Further recall that the truck driver had not been tested because Mr. Loudermilk had incorrectly

understood the testing policy to require testing only when the accident caused bodily injury.[195]

Finally recall that the driver was then immediately sent for a drug test.[196]

Mr. Smith argues that his question was protected activity because he had concerns that the

County was only requiring Black drivers (as opposed to white drivers) to take a drug test after an

accident.[197]   And, of course, it is true that voicing concerns about disparate treatment counts as

protected activity.[198]   The problem for Mr. Smith, however, is there is no evidence that Mr. Smith

suggested to anyone that this was an instance of racial discrimination.   The evidence does not

show that Mr. Smith voiced his internal belief that the failure to send this truck driver to get drug

tested after the accident had something to do with race, or that it was part of a larger drug-testing

problem, or anything of the sort.[199]   This is both a prong 1 and prong 3 deficiency.   Simply

checking that a co-worker got drug tested—without any reference to race—is not opposition to

unlawful race discrimination.   Even if it is, without any evidence that Mr. Loudermilk or Judge

Wheeless knew or suspected Mr. Smith's drug-testing question had something to do with race

discrimination, there is no way to say they knew about the protected activity in a way that would

allow the causal requirement of prong 3 to be met.

---

[194] *Id.* at 70:14–71:18.

[195] Loudermilk Dep. (Doc. 37) at 34:5–20.

[196] *Id.*

[197] Smith Dep. (Doc. 36) at 95:6–99:24.

[198] *See Gonzalez v. City of Minneapolis*, 267 F. Supp. 2d 1004, 1012 (D. Minn. 2003), *aff'd on other grounds,* 107 F. App'x 702 (8th Cir. 2004); 42 U.S.C. § 2000e-3(a).   It does not matter whether disparate treatment actually occurred. It only matters that Mr. Smith had a good faith, reasonable belief that such disparate treatment was occurring.   *See Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 714 (8th Cir. 2000).

[199] Smith Dep. (Doc. 36) at 70:14–71:18.

Mr. Smith's last assertion of protected activity concerns (1) his reporting to Judge Wheeless of the two offensive pictures put on an office window,[200] and (2) his reminder to Judge Wheeless of the "zero tolerance" policy for racial slurs when a co-worker used the N-word.[201] These two actions undoubtedly qualified as protected activity.   Moreover, Judge Wheeless obviously knew about this protected activity before (indeed, well before) he suspended Mr. Smith. But Mr. Smith faces a different causality problem here under prong 3 of the prima facie test.   That problem is the four months between Mr. Smith's oppositional activity and his suspension.   The oppositional activity took place in December of 2019 and the suspension was in May of 2020.[202]

While that length of time does not on its own make it impossible for Mr. Smith to make a causality showing,[203] it does make it harder.   And it certainly means that Mr. Smith must provide other evidence of causality between the activities and the adverse action.[204]   Mr. Smith has not done so.   This is fatal to his claims, even at this stage.   And that is even more apparent because there was a clearly intervening event between Mr. Smith's protected activity and Mr. Smith's much later suspension—the May 4, 2020 meeting that all parties agree got heated and confrontational.[205] Given all this, Mr. Smith's retaliation claims can't proceed to trial.

---

[200] *Id.* at 61:17–65:3.

[201] *Id.* at 66:8–16.

[202] Ex. 17 (Excerpts of Pl.'s Discovery Responses) to Mot. for Summ. J. (Doc. 24-17) at 2; Ex. 5 (Termination Letter) to Mot. for Summ. J. (Doc. 24-5).

[203] *See Sayger v. Riceland Foods, Inc.*, 735 F.3d 1025, 1032 (8th Cir. 2013).

[204] *See Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) (holding that an interval of two months between the protected activity and the adverse action "dilute[d] any inference of causation" and that the temporal connection alone "could not justify a finding in [the plaintiff's] favor on the matter of causal link").

[205] Def.'s Statement of Undisputed Facts (Doc. 26) ¶¶ 17–18, 20–23; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 30) ¶¶ 17–18, 20–23.

## CONCLUSION

For the reasons stated above, the Court GRANTS Crittenden County's Motion for Summary Judgment (Doc. 24).   Crittenden County is entitled to summary judgment on all claims.

IT IS SO ORDERED this 15th day of May 2024.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE